Scott A. Lucas
Law Offices of Scott A. Lucas
250 Park Avenue
20th Floor
New York, New York 10177
(212) 983-6000
*Attorneys for Plaintiff Hans Figi*



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
C. HANS FIGI,

               *Plaintiff,*

    -against-

ROSS INSTITUTE FOR ADVANCED
STUDY AND INNOVATION
IN EDUCATION, THE ROSS SCHOOL
and COURTNEY SALE ROSS,

               *Defendant.*
-------------------------------------------------------X

**COMPLAINT**

     Plaintiff C. Hans Figi ("Plaintiff" or "Figi"), by his attorneys, the Law

Offices of Scott A. Lucas, alleges as follows for his Complaint against Ross

Institute, The Ross School and Courtney Sale Ross (sometimes collectively

referred to herein as "Defendants"):

## <u>INTRODUCTION</u>

    1.    This is an action brought under this Court's diversity jurisdiction for a

money judgment of not less than $205,026 under New York Labor Law ("NYLL")

§§ 190, 193, 198(1-a) and 198(3), consisting of $102,513 in unpaid wages/wage

supplements and an equal amount as liquidated damages, together with statutory attorney's fees, or, in the alternative, for a money judgment of not less than $102,513 for common law breach of contract.

## JURISDICTION & VENUE

2.      This Court has diversity jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §1332(a)(1), in that there is complete diversity between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

3.      Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) because, *inter alia*, all three Defendants maintain residence in Manhattan.

## THE PARTIES

4.      Plaintiff Hans Figi ("Plaintiff") is a United States citizen with a legal domicile in the State of Montana.  Plaintiff is currently living on a temporary basis in the United Kingdom.

5.      Upon information and belief, Defendant Ross Institute for Advanced Study and Innovation in Education ("Ross Institute") is a registered not-for-profit corporation under section 501(c)(3) of the Internal Revenue Code, with its principal place of business at 560 Broadway, Suite 309, New York, NY 10012.

6.      Defendant Ross Institute has also designated 560 Broadway, Suite

309, New York, NY 10012 as the address for receiving service of process.

7.      Upon information and belief, Defendant The Ross School ("Ross School") is a New York State chartered private, independent coeducational school located at 18 Goodfriend Drive, East Hampton, NY 11937.

8.      According to Defendants, Ross Institute and Ross School operate as a single section 501(c)(3) entity.

9.      Defendant Courtney Sale Ross is an individual who, upon information and belief, maintains a Manhattan residence in Tribeca.

10.     Upon information and belief, Courtney Sale Ross is the founder, President and Chair of the Ross Institute and Ross School.


**The Employment Agreement**

11.     On or about July 1, 2011, Defendants, identifying themselves as "Ross Institute, d/b/a Ross School," entered into an Employment Agreement with Plaintiff effective as of August 1, 2011.

12.     Shortly thereafter the parties signed a one-page amendment changing the effective date of the Employment Agreement to August 25, 2011.

13.     The Employment Agreement and the amendment thereto are collectively referred to herein as the "Employment Agreement" and annexed hereto as Exhibit "A".

14.     The Employment Agreement specified that Plaintiff was to be employed by "ROSS INSTITUTE a/k/a ROSS SCHOOL" for a one-year term from August 25, 2011 through August 24, 2012.

15.     The Employment Agreement appointed Plaintiff as Director of Development and External Relations and specified that he would receive, *inter alia*, an annual base salary of $140,000 for the first year of employment and an end-of-year bonus of not less than $10,000. *See* Employment Agreement ¶¶ 2 and 3.A and B.

16.     The Employment Agreement also contained the following severance pay provision:

> Should Ross Institute decide to terminate this agreement prior to the completion date of employment for the Employee, except for Cause …, Ross Institute shall pay to the Employee upon the effective date of termination a sum of money equal to twelve months or the remainder of the Employee's contract, whichever is less, of his salary as severance pay to compensate the Employee for all rights and interests which he may have under this contract, and which the Employee hereby agrees shall be in full satisfaction of any and all claims for compensation or damage which the Employee might otherwise have as a result of early termination of his employment. Such severance payment will be made to the Employee … on a bi-weekly equal basis less applicable federal (including social security and Medicare), state and statutory withholdings from the date of termination until paid in full. Such severance payment shall not be considered as wages or compensation for purposes of any Ross School retirement or pension plan but shall be in addition to any entitlement to earned but unused vacation leave and shall not affect the Employee's rights to vested pension benefits.

Employment Agreement, ¶ 9.

17.     Plaintiff relocated from the United Kingdom to accept the position as Defendants' Director of Development and External Relations.

**Courtney Sale Ross's Status As An "Employer" Under The NYLL**

18.     The Employment Agreement was initially signed by Courtney Sale Ross on behalf of "Ross Institute" and the amendment thereto was signed by Courtney Sale Ross.

19.     At all material times herein, the founder, President and Chair of the Ross Institute and Ross School, Courtney Sale Ross, had the power to hire and fire employees of Ross Institute and Ross School and frequently exercised that power.

20.     At all material times herein, Courtney Sale Ross frequently supervised and controlled work schedules and conditions of employment of employees of Ross Institute and Ross School.

21.     At all material times herein, Courtney Sale Ross frequently supervised and determined rates and methods of payment of employees of Ross Institute and Ross School.

22.     At all material times herein, Courtney Sale Ross possessed the power to control Plaintiff and the other employees of Ross Institute and Ross School and frequently exercised that power.

23.     In addition, upon information and belief, at all material times herein Courtney Sale Ross was acting as an agent for a partially disclosed principal (Defendant Ross Institute for Advanced Study and Innovation) which was identified only as "Ross Institute".

**Plaintiff Performed His Obligations Under
The Employment Agreement**

24.     Plaintiff performed the duties of his position and satisfied his obligations under the Employment Agreement during the period of his employment.

**The Termination of Plaintiff's Employment**

25.     Plaintiff never received any warnings, reprimands, or notifications – either written or verbal – that his performance was inadequate or that his job was in jeopardy.

26.     On or about November 18, 2011, without warning, prior notice or cause, Plaintiff was notified that his employment was being terminated.

27.     The termination of Plaintiff's employment was consistent with the extremely high rate of turnover among employees of Ross Institute/Ross School.

28.     Defendants did not have legal "cause" to terminate Plaintiff's employment.

29.     As for the "Reason for Termination," the termination notice stated: "*Cause – not meeting expectations of the position of Director of Development*." *See* Exhibit "B" hereto.

30.      The termination notice did not provide any other explanation for Plaintiff's termination.

31.     Plaintiff was not given any other reason for the premature termination, apart from a comment by Ross's Chief Operating Officer, Jennifer Chidsey, that it was "*not a good fit*".

32.     Plaintiff tried to persuade Ms. Chidsey that it was Ms. Ross and not Plaintiff who was responsible for any lack of a "good fit," but Ms. Chidsey made it clear that she was unable or unwilling to try and influence Defendant Ross to reconsider her decision to terminate Plaintiff's employment.

33.     There were 268 days remaining on Plaintiff's unexpired one-year term when Defendants unilaterally terminated the Employment Agreement without cause.

34.     Accordingly, following the termination of Plaintiff's employment Defendants were responsible for paying Plaintiff wage supplements (severance pay) totaling $102,513 ($140,000 / 366 = $382.51; $382.51 x 268 = $102,513).

35.     Despite due demand by Plaintiff, Defendants thereafter failed and refused to honor their contractual obligation to pay the agreed-upon severance pay

to Plaintiff for the balance of Plaintiff's one-year term.

## AS AND FOR A FIRST CAUSE OF ACTION

## VIOLATIONS OF NYLL Article 6

36.     Plaintiff incorporates the allegations of paragraphs 1-35 of the Complaint as if set forth herein.

37.     Article 6 of the NYLL regulates the payment of wages by employers to employees.

38.     Plaintiff's substantive claim for unpaid wages/wage supplements is predicated on NYLL §§ 190 and 193, and the remedies he seeks (recovery of unpaid wages/wage supplements, liquidated damages and attorney's fees) are authorized by NYLL §§ 198(1-a) and 198(3).

39.     To prevail on a claim pursuant to Article 6, "a plaintiff must first demonstrate that he or she is an employee entitled to its protections." *Bierer v. Glaze, Inc.,* 2006 WL 2882569, at *9 (E.D.N.Y. Oct.6, 2006).

40.     Accordingly, Plaintiff has set forth the analysis below to demonstrate that he is "an employee entitled to [Article 6's] protections" (*Bierer*, *supra*) with respect to the unpaid severance pay at issue.

41.     While a "plaintiff cannot assert a statutory claim for wages under the Labor Law if he has no enforceable contract right to those wages," *Tierney v.*

8

*Capricorn Investors, L.P.,* 189 A.D.2d 629, 632, 592 N.Y.S.2d 700 (1st Dep't 1993), Plaintiff is entitled to the wage supplements he now seeks under his written Employment Agreement.

**Plaintiff Was An "Employee" of Defendants**

42.     NYLL § 190(2) defines an "employee" as "any person employed for hire by an employer in any employment."

43.     At all relevant times herein, Plaintiff was an "employee" because he was "employed for hire by an employer in any employment" (NYLL § 190(2)), subject to Defendants' control, designated as an employee, and subject to mandatory withholdings for taxes, social security contributions, *etc.*

44.     NYLL § 190(3), in turn, defines an "employer" to include "any person, corporation, limited liability company, or association employing any individual in any occupation, industry, trade, business, or service."

45.     At all relevant times herein, Defendants Ross Institute and Ross School were "employers" of Plaintiff because they are covered entities that employed Plaintiff in an "occupation, industry, trade, business, or service." NYLL § 190(3).

46.     At all relevant times herein, Defendant Courtney Sale Ross was a "person" who employed Plaintiff in an "occupation, industry, trade, business, or service."  NYLL § 190(3).

47.     Courtney Sale Ross, the founder, President and Chair of the Ross Institute and Ross School, hired Plaintiff, participated in supervising and controlling Plaintiff's work and conditions of employment, determined Plaintiff's rates and methods of payment, fired or otherwise authorized the firing or Plaintiff, and directed or authorized the non-payment of the agreed-upon severance pay owed to Plaintiff.

**Plaintiff Has A Viable Claim Under NYLL §§ 190, 193 and 198**

48.     NYLL Article 6 protects all employees, regardless of income or position, against non-payment of wages.  Article 6 also affords employees most likely to be living paycheck-to-paycheck additional protection by requiring that their wages be paid in a timely fashion.

49.     Specifically, while Article 6 entitles *all* employees to maintain a cause of action for non-payment of wages and wage supplements, *see* NYLL § 198(3) ("*All employees* shall have the right to recover full wages, benefits and wage supplements and liquidated damages…, whether such action is instituted by the employee or by the commissioner.") and NYLL § 193(1) ("No employer shall

make any deduction from the wages of an employee, except [for authorized deductions not applicable here]), it *also* entitles most low wage workers (those who are not executive, administrative or professional employees earning at least $900 per week) to sue for the *untimely payment* of wages. NYLL § 191.

50.     Thus, while a highly paid employee cannot sue under NYLL § 191 for late (untimely) wage payments, he *can* sue under NYLL § 193 if his employer permanently retains (*i.e.*, deducts) his wages. *Tortorella v. Postworks New York, LLC*, 2011 WL 3020860 (N.Y.Sup.), 2011 N.Y. Slip Op. 32014(U) ("Unlike Section 191, Section 193 applies to employees notwithstanding their positions as executives or managers.").

51.     Plaintiff is therefore not excluded from the protections of NYLL §§ 190, 193 and 198, notwithstanding his title, duties or salary.


**NYLL § 190(1)'s Definition of "Wages"**
**Includes "Wage Supplements"**
**Such As Severance Pay**

52.     NYLL § 190(1)'s definition of "wages" includes "wage supplements" such as severance pay.

53.     NYLL § 190(1) provides, in pertinent part, that "[t]he term 'wages' also includes benefits or wage supplements as defined in [NYLL § 198-c], except for the purposes of [NYLL §§ 191 and 192]."

54. NYLL § 198-c, in turn, defines "benefits or wage supplements" to include "separation … pay," *i.e.*, severance pay. NYLL § 198-c(2).

55. Since NYLL § 198-c defines "wage supplements" to include severance pay, and since § 198-c's definition of "wage supplements" is incorporated by reference into NYLL §190(1)'s definition of "wages," severance pay constitutes "wage supplements" under NYLL § 190(1).

56. And since NYLL §190(1)'s definition of "wages" includes "wage supplements," severance pay also constitutes "wages" under NYLL §190(1).

**NYLL § 190(1) does not incorporate
any other provision of NYLL § 198-c
besides § 198-c's *definition* of "benefits or wage supplements"**

57. Unlike the civil provisions under which Plaintiff's NYLL claims arise (§§ 190, 193, 198), NYLL § 198-c is a criminal statute.

58. An employer found guilty of violating NYLL § 198-c may be criminally fined and imprisoned for up to one year. NYLL § 198-c(1); NYLL § 198-a(1).

59. However, an employer is exempt from criminal liability under § 198-c if the employee whose wage supplements were not paid was a "bona fide executive, administrative, or professional capacity whose earnings are in excess of nine hundred dollars a week." NYLL § 198-c(3) ("This section [§ 198-c] shall not

12

apply to any person in a bona fide executive, administrative, or professional capacity whose earnings are in excess of nine hundred dollars a week.").

60.    The question has arisen as to whether § 198-c(3)'s limited exemption from *criminal* liability should be construed to shield offending employers from *civil* liability under the civil provision of Article 6 (*i.e.*, §§ 190, 193, 198(1-a) and 198(3)) that are completely separate and distinct from § 198-c(3).

61.    There is no reason why § 198-c(3)'s limited exemption from *criminal* liability should be construed to shield offending employers from *civil* liability under civil provisions of Article 6 (i.e., §§ 190, 193, 198(1-a) and 198(3)) that are completely separate and distinct from § 198-c(3).

62.    Such a construction would violate NYLL § 198(3)'s command that "*All employees* shall have the right to recover full wages, benefits and wage supplements and liquidated damages…, whether such action is instituted by the employee or by the commissioner."

63.    Since § 198(3) commands that "*All employees* shall have the right to recover full wages, benefits and wage supplements and liquidated damages" and can maintain a civil action to recover same, it is necessary to consider the definition of the word "all" before determining whether "all" only means "some".

64.    "All" means "the whole amount or quantity of; as much as possible; every member or individual component of." *Wilder v. Bernstein*, 153 F.R.D. 524,

13

530 (S.D.N.Y. 1994). Accordingly, the fact that "*[a]ll employees*" are entitled to sue under the civil provisions of NYLL Article 6 to recover unpaid wage supplements means that *all employees* – including those serving in a bona fide executive, administrative, or professional capacity whose earnings exceed $900 a week – are entitled to sue under the civil provisions of NYLL Article 6 to recover unpaid wage supplements.

65. Further, NYLL § 190(1) does *not* incorporate § 198-c(1) or § 198-c(3), but rather only the *definition* of "benefits or wage supplements" in § 198-c(2).

66. In other words, NYLL § 190(1) does *not* incorporate any other provision of NYLL § 198-c besides § 198-c(2)'s *definition* of "benefits or wage supplements". NYLL § 190(1) ("The term 'wages' also includes benefits or wage supplements as *defined* in [§ 198-c]…").

67. When one statute only incorporates a *definition* contained in another statute, it is only the statutory *definition* – and not the entire statute – that is incorporated by reference. *See*, *e.g.*, *U.S. v. Young*, 248 F.3d 260, 274-75 (4th Cir. 2001) (citing cases); *Keller v. C.I.R.*, 569 F.3d 710, 725 (9th Cir. 2009) (citing cases).

68. Where, as here, the forum state's highest court has not decided the issue at hand, it is the "job [of a federal court sitting in diversity] to predict how the

forum state's highest court would decide the issue[.]" *DiBella v. Hopkins*, 403 F.3d 102, 111 (2d Cir. 2005).

69.     Upon information and belief, in determining whether § 198-c(3)'s limited exemption from *criminal* liability should be treated as a shield that shelters offending employers from *civil* liability arising under totally different sections of Article 6 (i.e., §§ 190, 193, 198(1-a) and 198(3)), the New York Court of Appeals would specifically consider the fact that § 190(1) does *not* incorporate any other provision of NYLL § 198-c besides § 198-c(2)'s *definition* of "benefits or wage supplements".

70.     Upon information and belief, in determining whether § 198-c(3)'s limited exemption from *criminal* liability should be treated as a shield that shelters offending employers from *civil* liability arising under totally different sections of Article 6 (i.e., §§ 190, 193, 198(1-a) and 198(3)), the New York Court of Appeals would specifically consider § 198(3)'s command that "*All employees* shall have the right to recover full wages, benefits and wage supplements and liquidated damages…"

71.     The fact that employers cannot be *criminally* prosecuted under NYLL § 198-c for withholding benefits or wage supplements from certain employees does not provide immunity from *civil* liability because § 190(1) does *not* incorporate § 198–c in its *entirety*, but rather only the *definition* of "benefits and wage

supplements" contained therein. *See*, *e.g.*, *Miteva v. Third Point Mgmt. Co., L.L.C.*, 323 F. Supp. 2d 573, 579 (S.D.N.Y. 2004) (Marrero, J.) ("Section 198-c of Article 6, which addresses the payment of benefits and wage supplements, is analogous to § 192, in that § 198-c(3) specifically states that '*[t]his section* shall not apply to any person in a bona fide executive, administrative, or professional capacity whose earnings are in excess of six hundred dollars a week.' § 198-c(3). Like the language in § 192(2), by excluding executives and professionals from *that section,* the language in § 198-c suggests that those individuals would otherwise fall under the § 190(2) definition of 'employee.' To summarize, executives, administrators, and professionals are specifically excluded from only the three provisions of Article 6 discussed above: §§ 190(7), 192(2), and 198-c(3).") (emphasis in original); *Schutty v. Pino*, 1997 WL 363812, *3 (S.D.N.Y. July 1, 1997) ("[T]here is nothing in that provision [NYLL § 198-c] which applies that exclusion to any penalties other than the criminal penalty specifically provided in Section 198–c."); *Metchick v. Bidermann Indus. Corp.*, 1993 WL 106139, at *3 (S.D.N.Y. Apr. 7, 1993) ("the clear language of §§ 190(1) and 198–c(2) indicates that the payments sought by Metchick, which comprise separation pay based on his previous salary payments, are within the scope of the term 'wages' as used in § 198(1–a)."); *Tischmann v. ITT/Sheraton Corp.*, 882 F. Supp. 1358, 1370, n. 9 (S.D.N.Y. 1995) ("Severance pay clearly falls within the [NYLL's] broad

16

definition of 'wages.'"); *Castagna v. Luceno*, 2011 WL 1584593, at *21 (S.D.N.Y. Apr. 26, 2011) (noting split of authority, and concluding that plaintiff has a civil cause of action "under the Labor Law" for unpaid severance benefits defined in § 198-c(2), but not specifying the substantive provision of Article VI under which the claim arises); *De Soiza v. Unz & Co.*, 1999 N.Y. Misc. LEXIS 415, at **17-18 (N.Y.Sup. 1999) ("Strictly speaking, *Labor Law § 198-c[3]* is concerned with defining the misdemeanor of failure to pay benefits or wage supplements, which are specifically excluded from the definition of wages for the purposes of an action for failure to pay wages under *Labor Law § 191*. 'However, there is nothing in that provision which applies that exclusion to any penalties other than the criminal penalty specifically provided in *Section 198-c*.'"); *Lynch v. Upper Crust, Inc.*, Index No. 603769/00, page 10 (N.Y.Sup., March 15, 2001), online at

http://decisions.courts.state.ny.us/fcas/FCAS_docs/2001MAR/30060376920001SC IV.PDF ("[M]andatory severance pay is within the definition of wages found in section 190(1) of the Labor Law. *** The limitation found in section 198-c(3) of the Labor Law does not apply to the present claim since this provision applies only to section 198-c which makes it a misdemeanor for persons or corporate entities to withhold benefits or wage supplements.") (citations omitted), *modified on other grounds* 294 A.D.2d 237 (1ˢᵗ Dep't 2002); *Saunders v. Big Bros., Inc.*, 115 Misc. 2d 845, 848, 454 N.Y.S.2d 787, 790 (Civ. Ct. 1982) (suit for unpaid severance:

"As [NYLL §§ 197 and 198] recognize, the equities involved in denying an employee wages or benefits that they have already earned are quite different than those involved in whether and when an employee may be terminated. These sections, which reflect a strong legislative policy aimed at redressing the power imbalance between employer and employee, mandate that, above all, an employee is entitled to collect wages and benefits earned."); *Romanello v. Sanpaolo*, 2010 WL 2262284, at *6 (N.Y. Sup. 2010) (correctly concluding that plaintiff has a claim for unpaid severance pay under NYLL Article 6, but erroneously identifying the basis for that claim as § 198-c – a *criminal* statute – rather than the *civil* provisions of Article 6, *e.g.*, §§ 190, 193 and 198); *Gerlach v. The Horn & Hardart Co.*, 683 F. Supp. 342, 346 (S.D.N.Y. 1988) (Carter, J.) ("Defendant asserts that any compensation it may owe plaintiff under the Agreement does not constitute 'wages' within the meaning of this provision. Labor Law § 190(1), however, states in relevant part that 'benefits or wage supplements as defined in section [198–c] of this article' come within the compass of the term 'wages,' and section 198–c(2), in turn, defines the term 'benefits or wage supplements' to include retirement benefits and separation pay. Since the express purpose of the Agreement was to provide plaintiff with 'salary, benefits and other ... arrangements in connection with [his] resignation,' it follows that any benefits owing under its terms are wages within the meaning of Article 6 of the Labor Law."); *See also* 26 C.F.R. § 31.3401(a)-1(b)(4)

("[a]ny payments made by an employer to an employee on account of ... involuntary separation ... constitute wages" for income tax withholding purposes); *But see Wagner v. Edisonlearning, Inc.*, 2009 WL 1055728, *2, n. 28 (S.D.N.Y. Apr. 17, 2009) (concluding that plaintiff cannot sue for unpaid severance under Article 6, relying on cases that do not contain any textual analysis of whether § 190(1)'s definition of "benefits and wage supplements" incorporates § 198-c in its entirety, or, as specified in the text of § 190(1), only § 198-c's *definition* of "benefits and wage supplements").

72.    Finally, in determining whether § 198-c(3)'s limited exemption from *criminal* liability should be treated as a shield that shelters offending employers from *civil* liability arising under totally different sections of Article 6 (i.e., §§ 190, 193, 198(1-a) and 198(3)), the New York Court of Appeals would also consider the fact that unlike statutes prescribing criminal penalties (such as § 198-c), which must be strictly construed, remedial statutes (such as NYLL § 193) are to be liberally construed for the benefit of employees. *Samiento v. World Yacht, Inc.*, 10 N.Y.3d 70, 78, 883 N.E.2d 990 (2008) (construing NYLL § 196-d).

**An Employer's Non-payment Of Wages Violates NYLL § 193**

73.     NYLL § 193 provides that "No employer shall make any deduction from the wages of an employee," except for certain authorized deductions not applicable here.

74.     Since the severance is a benefit or wage supplement, and therefore a "wage" (NYLL § 190(3)), Defendants' non-payment, *i.e.*, permanent retainage, of Plaintiff's severance was an unlawful wage deduction in violation of § NYLL 193.

75.     The word "deduction" means "permanent retainage". *Snyder Constr. Co. v. State*, 73 A.D.2d 50 (3d Dep't 1980) ("The critical word 'deduction' is not defined in the contract. It connotes a permanent retainage, whereas the word 'withhold' connotes a temporary suspension."), *rev'd on other grounds* 53 N.Y.2d 613 (1981).

76.     Just as 100 minus 100 equals zero, the permanent retainage, *i.e.*, non-payment, of wages owed constitutes a deduction from wages owed.

77.     Although a few courts had previously assumed that there is a material distinction between not paying wages and deducting wages, this year New York's highest court confirmed there is, in fact, no material distinction for purposes of § 193 between not paying wages and deducting wages. *Ryan v. Kellogg Partners Institutional Services*, 19 N.Y.3d 1, 15-16, 968 N.E.2d 947 (2012) (employer's neglect to pay non-discretionary $175,000 bonus violated NYLL § 193).

78.     Defendants' violation of § 193 was not the result of a good faith misunderstanding of their legal obligations to Plaintiff.

79.     As an "employee" (NYLL § 190(2)) whose "wages" (NYLL § 190(1)) have been unlawfully withheld by his "employer(s)" (NYLL § 190(3)), Plaintiff is entitled to recover unpaid wages/wage supplements (severance pay) totaling $102,513 under NYLL § 193 and liquidated damages totaling $102,513 and attorney's fees under NYLL §§ 198(1-a) and 198(3), together with attorney's fees, costs and disbursements.

## SECOND CAUSE OF ACTION

## (Pleaded in the Alternative)

## BREACH OF CONTRACT

80.     Plaintiff repeats and realleges the allegations of paragraphs 1-79 as if set forth herein.

81.     In the event Defendants are not found liable on Plaintiff's first cause of action for violating NYLL Article 6, Defendants are liable for common law breach of contract.

82.     Defendants offered to pay Plaintiff compensation under the Agreement as set forth above for a one year term, and to continue paying such

compensation in the event Plaintiff was terminated prior to the expiration of that one year term unless Plaintiff was terminated for "cause".

83.     Plaintiff agreed to accept the terms and conditions set forth in the Employment Agreement and duly performed and fulfilled his material obligations thereunder.

84.     Defendants failed and refused to pay Plaintiff according to the terms of the Employment Agreement, despite due demand by Plaintiff.

85.     Plaintiff's termination for "not meeting expectations" does not constitute legal "cause" for terminating Plaintiff's employment.

86.     As a result, Defendant is liable for unpaid severance pay totaling not less than $102,513 for common law breach of contract, together with pre-judgment interest and costs.

**WHEREFORE**, Plaintiff respectfully requests judgment as follows:

(a)     On his first cause of action under NYLL §§ 190, 193, 198(1-a) and 198(3), not less than $205,026, consisting of $102,513 in unpaid wages/wage supplements and an equal amount as liquidated damages, together with statutory attorney's fees, prejudgment interest, costs and disbursements; or, in the alternative,

(b) On his second cause of action, money damages for unpaid severance totaling not less than $102,513, together with prejudgment interest, costs and disbursements.

Dated:     New York, New York
           July 26, 2012

          Law Offices of Scott A. Lucas

          By:  _____
              Scott A. Lucas (SL-6316)
              250 Park Avenue
              20th Floor
              New York, New York 10177
              (212) 983-6000
              *Attorneys for Plaintiff C. Hans Figi*

# EXHIBIT A

# EMPLOYMENT AGREEMENT

This Employment Agreement (the "Agreement") is made as of August 1, 2011 ("Effective Date") between Ross Institute, d/b/a Ross School, ("Ross School/Institute" or "School/Institute") and C. Hans Figi (the "Employee") ("Ross School" and the "Employee," collectively, the "Parties"). In consideration of the covenants and conditions set forth below, the parties, intending to be legally bound, agree as follows:

1.    <u>Term</u>. This Agreement commences as of the Effective Date and continues until terminated in accordance with paragraph 8 of this Agreement (the "Term").

2.    <u>Duties</u>.

The Employee serves as Director of Development and External Relations for Ross School. The Employee's Job Description is incorporated herein as found in "Attachment A."

     A.    The Employee reports to Courtney Sale Ross ("CSR"), Chair of the Board of Trustees and, as applicable, her designee on matters of strategic goal-setting and achievement of goals. For Ross School day-to-day functions, the Employee will report to the Head of School and CFO/Director of Finance and Advancement. Although the Employee reports to the Head of School and CFO/Director of Finance and Advancement to receive instruction as to the specifics of his duties, the parties understand that the Employee is responsible for all programs, initiatives, strategic planning and operations at the Institute and School that involve Development.

     B.    The Employee works and collaborates with the leadership of Ross School, Ross Institute Chief Academic Officer and any other professionals at the Institute and its affiliated entities and any consultants. The Employee is expected to devote fully his professional time and attention to his responsibilities and the duties of the School/Institute, to conduct himself with the utmost professionalism, to comply with all School/Institute policies, rules and regulations as they may be established, and to cooperate in promoting the best interests of the Institute and its affiliated entities.

3.    <u>Compensation</u>.

     A.    During the Term, for services rendered, the Institute will pay the Employee an annual salary of One Hundred Forty Thousand Dollars ($140,000.00), less applicable federal, state, and local withholdings, payable bi-weekly. The Employee will be entitled to an annual review of his salary and consideration of a salary adjustment. In no event shall his annual salary for full-time work be set at an amount less than his current salary without his written agreement.

     B.    A bonus of not less than $10,000 will be awarded at the end of one full year of employment contingent upon meeting agreed upon performance goals set by CSR, the Head of School and the CFO/Director of Finance and Advancement.

     C.    Upon renewal of the Employee's employment agreement, at the end of this term in July 2012, the Employee's annual salary will be not less than $150,000.

D.     The Employee will be eligible to take up to four (4) weeks, not all consecutively, of paid vacation, the timing of which will be decided mutually by the parties, consistent with Ross Institute policy and the Institute's educational schedule.

E.     The Employee will be eligible to participate in the employee benefit plans sponsored by the Institute, which are available during the term, subject to the terms of applicable benefit plans. The Institute may, at any time, amend, modify, suspend or terminate any employee benefit plan, program or arrangement for any reason without his consent. The employee benefit plans are detailed in Ross Institute and School Employee Handbook.

F.     The Institute shall provide a tuition benefit of 55% and a waiver of a new student fee. Consistent with the Employee Handbook, the Institute shall provide a tuition benefit for each child enrolled at the School at the tuition rate in effect for the applicable grade level(s). The Employee will be responsible for any taxes that may result from such payments.

G.     The Employee will be entitled to up to $15,000.00 toward reimbursement of applicable relocation expenses.

H.     All expense reimbursements and in kind benefits provided under this Agreement will be made or provided in accordance with the requirements of Code § 409A, including, where applicable, the requirement that (i) the amount of expenses eligible for reimbursement, or in kind benefits provided, during a year may not affect the expenses eligible for reimbursement, or in kind benefits to be provided, in any other year, (ii) the reimbursement of an eligible expense will be made on or before the last day of the year following the year in which the expense is incurred, and (iii) the right to reimbursement or in kind benefits is not subject to liquidation or exchange for another benefit.

4.     <u>Expense Reimbursements</u>.     The Institute will reimburse the Employee for reasonable and necessary business expenses, provided that for expenses in excess of $250.00, the Employee obtains the Institute's approval before incurring those expenses. The Employee also must maintain and promptly provide to Ross School Accounting Department copies of receipts for those expenses when seeking reimbursement.

5.     <u>Confidential Information</u>

A.     "Curriculum Writing Project" refers to the Institute's project to collate, organize, and harmonize all parts of its K-12 curriculum.

B.     "Protected Parties" means:

(i)     Ross Institute, Ross School, or Ross Global Academy, any other educational entity licensed by Ross Institute during the Term described in Employee's employment, and any of their current or former parents, alumni, or students, current or former officers, directors, or trustees, or current or former employees;

(ii)     CSR and members of CSR's family (including her deceased husband Steven J. Ross);

(iii) Trusts for the benefit of CSR or CSR's family;

(iv) Corporations or other entities controlled directly or indirectly by CSR or any member of CSR's family, or corporations or other entities on which CSR or members of CSR's family sit on a board of directors or trustees.

C.   "Ross Method" refers to method of education and the curriculum and training methods employed at Ross School, Ross Global Academy, and any other school licensed by Ross Institute.

D.   Employee acknowledges that, during the period of his employment by Ross Institute, he will have access to and possession of Confidential Information. Confidential Information includes:

(i) All non-public information, documents and/or materials, verbal, written, or electronic, that are disclosed by Ross Institute to the Employee, or of which the Employee may learn or become aware of from discussion or dealings with Ross Institute;

(ii) Ross Institute's "Ross Method" of education;

(iii) Ross Institute's "Curriculum Writing Project";

(iv) All non-public information, documents and/or materials, verbal, written, or electronic, concerning the curriculum and training provided or developed by Ross Institute or its affiliated entities; or

(v) All non-public information, documents and/or materials, verbal or written, concerning or related to the Protected Parties, including their financial, business, employee, health, and other personal information.

E.   <u>Prohibited Use and Disclosure of Confidential Information</u>.   Employee agrees that, during the course of employment with Ross Institute, except as required by his duties, and at all times thereafter, except as authorized in writing by Ross Institute, he will not directly or indirectly use, disclose, copy, destroy, furnish or make accessible to anyone any Confidential Information.

F.   <u>Ross Institute Property</u>.

(i) Employee acknowledges that all originals and copies of materials, records, and documents (including materials maintained electronically) that he generates or that come into his possession, custody or control during the course of his employment with Ross Institute regarding or derived from Confidential Information are the sole property of Ross Institute or the applicable Protected Party.

(ii) Upon termination of Employee's employment, or upon the request of Ross Institute at any time, Employee will promptly deliver to Ross Institute all copies of the materials described in paragraph 5.F (i) above. During Employee's employment with Ross Institute and at all times thereafter, he will not remove or cause to be removed from Ross

premises or the possession of any applicable Protected Party any record, file memorandum, document, equipment or other item relating to or derived from Confidential Information, including any data or information stored electronically, except in furtherance of his legitimate duties as a Ross Institute employee.

6. Non-Disparagement. The Parties agree that they will not publish or communicate to any person or entity any disparaging remarks, comments or statements concerning Ross Institute or any of its employees, agents, affiliates, directors, trustees, subsidiaries, or assigns or concerning C. Hans Figi. This obligation survives termination of this Agreement.

7. Intellectual Property Ownership and Use of Materials.

A. "Materials" means all works of authorship, data, databases, discoveries, designs, developments, ideas, inventions, processes, improvements, know-how, techniques, and useful ideas of any description whatsoever (or portions of them).

B. "Ross Materials" means all Materials that the Employee creates or conceives during the period of his employment with Ross Institute, whether or not patentable or registerable under copyright, trademark or similar statutes, and whether or not consisting of, derived from, or relating to Confidential Information, which (i) are related to or useful in the current or anticipated business or activities of Ross Institute; (ii) fall within Employee's responsibilities as an Employee of Ross Institute; or (iii) are otherwise created or developed by the Employee through the use of Confidential Information; Ross Institute's equipment, software, other facilities, or resources; or at times during which the Employee is or is intended to be serving Ross Institute as an Employee.

C. All Ross Materials created or developed by Employee during his employment by Ross Institute are "work made for hire"; thus, under United States copyright law, Ross Institute is considered the "author" and owner of those materials. If any of Ross Materials are not "work made for hire," the Employee hereby irrevocably assigns to Ross Institute, all right, title and interest in those Ross Materials, including all copyrights, patents, and trademarks rights and goodwill associated in all jurisdictions of the world. The provisions of this paragraph apply to all Ross Materials that are conceived or developed by the Employee (alone or jointly with others), whether or not further development or reduction to practice takes place after the termination of the Employment Agreement. To the extent possible, Employee hereby irrevocably waives all moral rights (if any) and all similar rights (if any) that the Employee has or may have in or to Ross Materials. Ross Institute may use or not use Ross Materials or any portions thereof, with or without other elements, in its sole discretion.

D. The Employee will execute and deliver to Ross Institute all further documents that Ross Institute or its agents or designees reasonably request in order to perfect, confirm, defend, police and enforce Ross Institute's rights in Ross Materials and for those purposes will provide all reasonable assistance reasonably requested by Ross Institute at Ross Institute's expense.

E. The Employee will disclose to Ross Institute all discoveries and inventions that are Ross Materials promptly after their conception. Whenever requested by Ross Institute,

the Employee will promptly deliver to Ross Institute copies of any and all Ross Materials in their then-current state of development in their then-current format or a format reasonably specified by Ross Institute. The Employee agrees that those copies are and will be Ross Institute's sole property and that Ross Institute (or its designees) may use them for any purpose whatsoever.

F.    No Other Restrictions. The Employee represents and warrants that, to the best of his knowledge, he is not a party to or subject to any informal or formal agreement or restrictions limiting his ability to fulfill his obligations under this Agreement.

8.    Evaluation. The Employee will set professional goals during the first month of employment and review these with supervisors, making adjustments where requested. The performance of the employee will be reviewed formally after six months of employment against these goals and the expectations of the position description. An annual review will occur within the last two months of each year of employment between April 30 and June 30. Employee will receive an annual letter of employment by May 30 that will clarify his status for the upcoming year. This formal review will be conducted by supervisors and the Ross Institute Board.

9.    Termination of Employment. Should Ross Institute decide to terminate this agreement prior to the completion date of employment for the Employee, except for Cause or the voluntary resignation by the Employee, Ross Institute shall pay to the Employee upon the effective date of termination a sum of money equal to twelve months or the remainder of the Employee's contract, whichever is less, of his salary as severance pay to compensate the Employee for all rights and interests which he may have under this contract, and which the Employee hereby agrees shall be in full satisfaction of any and all claims for compensation or damage which the Employee might otherwise have as a result of early termination of his employment. Such severance payment will be made to the Employee, or in the event of his death, while receiving severance payments, to his estate, on a bi-weekly equal basis less applicable federal (including social security and Medicare), state and statutory withholdings from the date of termination until paid in full. Such severance payment shall not be considered as wages or compensation for purposes of any Ross School retirement or pension plan but shall be in addition to any entitlement to earned but unused vacation leave and shall not affect the Employee's rights to vested pension benefits.

10.    Representations. The Employee represents and warrants to Ross Institute that, as of the date of signing this Agreement, the Employee is not a party to any contract or agreement which will or may restrict in any way his ability to fully perform the duties and responsibilities under this Agreement.

11.    Counterparts. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument, and it will not be necessary in making proof of this Agreement to produce or account for more than one such counterpart.

12.    Entire Agreement and Amendment. This Agreement may be amended only by an agreement in writing signed by both Parties. This Agreement, its Schedules and Ross Institute/School Employee Handbook (see Paragraph 16 E), all of which are incorporated in this



5



Agreement, contain the Parties' entire agreement superseding all prior agreements and understandings, oral or written, with respect to the subject matter of this Agreement.

13. Choice of Law. This Agreement will be construed and take effect in all respects in accordance with the laws of the State of New York applicable to agreements made and performed in that State.

14. Enforceability. If any term, provision, covenant or restriction of this Agreement, or any part thereof, is held by a court of competent jurisdiction of any foreign, federal, state, county or local government or any other governmental, regulatory or administrative agency or authority to be invalid, void, unenforceable or against public policy for any reason, the remainder of the terms, provisions, covenants and restrictions of this Agreement will remain in full force and effect and will in no way be affected, impaired or invalidated unless doing so deprives either party of a material benefit of the Agreement.

15. Headings; Construction. The section headings in this Agreement are for reference purposes only and do not in any way affect the meaning or interpretation of the Agreement. The word "including" is intended to be inclusive and incorporate the meaning "without limit."

16. Miscellaneous.

A. The failure of a party to insist on strict adherence to any term of this Agreement on any occasion will not be considered a waiver thereof or deprive that party of the right to later insist upon strict adherence to that term or any other term of this Agreement. No waiver of any breach of this Agreement will be deemed to be a waiver of any preceding or subsequent breach of this Agreement.

B. The rights and duties of the Parties are not assignable or delegable, except that the Institute may assign this Agreement and all rights and obligations in it to any corporation or other business entity that succeeds to all or substantially all of its business through merger, consolidation, corporate reorganization or acquisition of all of its assets.

C. The Institute has given the Employee the opportunity to consult with an attorney regarding this Agreement. The Employee represents and warrants that he has relied on his own judgment and, as applicable, the judgment of his legal counsel regarding every aspect of this Agreement.

D. Employee understands and acknowledges that he has a responsibility to seek advice from his own tax, legal and financial advisors with respect to this Agreement. Neither the School nor any trustee, employee or agent of the School makes any guarantee of any tax consequences with respect to his employment with the School or the terms of this Agreement or for any other purpose, including, without limitation, Code § 409A. The Agreement will be interpreted and administered in accordance with the applicable requirements of, and exemptions from, Code § 409A in a manner consistent with Treas. Reg. § 1.409A-1(c). To the extent payments and benefits are subject to Code § 409A, this Agreement shall be interpreted, construed and administered in a manner that satisfies the requirements of (i) Code § 409A(a)(2), (3), and (4), (ii) Treas. Reg. § 1.409A-1 et seq., and (iii) transitional relief under IRS Notice



6

2007-86, and (iv) other applicable authority issued by the Internal Revenue Service and the U.S. Department of the Treasury.

E. In addition to the terms and conditions of this Agreement, the Employee's employment is subject to the terms and conditions of Ross School Employee Handbook, a copy of which previously was provided to Employee, and to other employment rules and policies that the Institute may implement in its sole discretion.

F. The terms and conditions of his employment are also subject to the rules and regulations imposed upon Ross School under all applicable federal, state and local laws.

IN WITNESS WHEREOF, the parties have executed the Agreement as of the date and year first above written.

*ROSS INSTITUTE*

By: _____     Date _____
        *Courtney Sale Ross*

*C. HANS FIGI*

_____     Date June 29, 2011

## _AMENDMENT TO EMPLOYMENT AGREEMENT_

In accordance with Paragraph 12 of the Employment Agreement executed July 1,
2011 between the Ross Institute d/b/a Ross School and C. Hans Figi, the Agreement will
be amended as follows:

1. Paragraph 1: Term. This Agreement commences as of August 25, 2011 and continues until August 24, 2012 or until terminated in accordance with paragraph 9 of this Agreement (the "Term").

2. Paragraph 3C: Upon renewal of the Employee's employment agreement, at the end of this term in August 2012, the Employee's salary will be not less than $150,000.

3. Paragraph 8 last three sentences: An annual review will occur within the last two months of each year of employment between May 30 and July 30. Employee will receive an annual letter of employment by July 31 that will clarify his status for the upcoming year. This formal review will be conducted by supervisors and the Ross Institute Board.

Dated: AUG. 8, 2011

_____
Hans Figi

Dated:

_____
Courtney Sale Ross

_[handwritten notes:]_

" ADJUST WHEN
BACK.
ADD DAYS /
HOURS. "

MOVE EXP.
FLIGHTS
GOLF BAG

₹ 55 × 2
$ 140 to CT ——— TAXIS — BOTH ENDS
& TICKET #₹120
JITNEY + TAXI
₹ 100 — ↑ DOG + HOUSESIT
+ AUG 15, 16, 17.

**EXHIBIT B**

## ROSS SCHOOL
## 18 GOODFRIEND DRIVE
## EAST HAMPTON, NY 11937


DATE:        11-18-11

EMPLOYEE:        C. Hans Figi

DEPARTMENT:        Development


This is an official notice of the termination of the Ross School employee,


REASON FOR TERMINATION:        Cause—not meeting expectations of the position
of Director of Development


BENEFITS:        Your employee benefits (including medical, dental, short and/or long term disability insurance, pension, and life insurance) shall end on 11-30-11. After your employee benefits end, eligible employees may continue medical, dental and hospitalization insurance coverage at their own expense pursuant to the Federal regulations of COBRA. You will receive information on COBRA in a later mailing.

ACCRUED AND UNUSED VACATION:  3 days


Employee Signature: _____ Date: _____

Supervisor Signature: _____ Date: _____

Witness Signature: _____ Date: _____